UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CORNESHA HEARD and CORNELIUS HEARD, JR., by guardian ERICA ERVIN, as children, next of kin, and next friends of CORNELIUS HEARD, SR., deceased,<br><br>    Plaintiffs,<br><br>v.<br><br>WESTROCK COMPANY, WESTROCK CP, LLC, WESTROCK SERVICES, LLC, WESTROCK-SOUTHERN CONTAINER, LLC, and WESTROCK RKT, LLC,<br><br>    Defendants. | Case No. _____<br><br>JURY DEMAND |

## COMPLAINT

COME NOW Plaintiffs Cornesha Heard and Cornelius Heard, Jr., by his guardian Erica Ervin, as children, next of kin, and next friends of Cornelius Heard, Sr., deceased, by and through counsel, and for their complaint against Defendants WestRock Company, WestRock CP, LLC, WestRock Services, LLC, WestRock-Southern Container, LLC, and WestRock Rkt, LLC, allege as follows:

### INTRODUCTION

1. This is a civil action seeking damages against Defendants WestRock Company, WestRock CP, LLC, WestRock Services, LLC, WestRock-Southern Container, LLC, and WestRock Rkt, LLC, for the wrongful death of Cornelius Heard, Sr., deceased, brought pursuant to Tenn. Code Ann. sections 20-5-106(a), 20-5-107(a), and 20-5-110(a).

## PARTIES

2. Plaintiffs Cornesha Heard and Cornelius Heard, Jr., and the decedent, Cornelius Heard, Sr., were at all times herein residents of Hamilton County, Tennessee.

3. Defendant WestRock Company is a Delaware limited liability corporation with its principal place of business located at 1000 Abernathy Rd. NE, Suite 125, Atlanta, Georgia 30328. The registered agent for Defendant is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

4. Defendant WestRock CP, LLC, is a Delaware limited liability corporation with its principal place of business located at 1000 Abernathy Rd. NE, Suite 125, Atlanta, Georgia 30328. The registered agent for Defendant is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

5. Defendant WestRock Services, LLC, is a Georgia limited liability corporation with its principal place of business located at 1000 Abernathy Rd. NE, Suite 125, Atlanta, Georgia 30328. The registered agent for Defendant is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

6. Defendant WestRock-Southern Container, LLC, is a Delaware limited liability corporation with its principal place of business located at 1000 Abernathy Rd. NE, Suite 125, Atlanta, Georgia 30328. The registered agent for Defendant is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

7. Defendant WestRock Rkt, LLC, is a Georgia limited liability corporation with its principal place of business located at 1000 Abernathy Rd. NE, Suite 125, Atlanta, Georgia 30328. The registered agent for Defendant is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

9. There is complete diversity between the parties because, for the purpose of determining diversity of citizenship, Plaintiffs are citizens of the State of Tennessee and Defendants are citizens of the States of Georgia or Delaware.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the acts or omissions giving rise to this claim occurred in this judicial district.

## ALLEGATIONS OF FACT AND WRONGFUL DEATH

11. Defendants operate one of the world's largest paper and packaging companies, with approximately $15 billion in annual revenue and 42,000 employees in 30 countries.

12. Among Defendants' 275 operating and business locations is a paperboard box manufacturing facility located at 701 Manufacturer's Road, Chattanooga, TN 37405 (the "Chattanooga mill"). Upon information and belief, Defendants jointly own, operate, and/or manage this facility.

13. Upon information and belief, Defendants jointly control the employment of workers at the Chattanooga mill. Defendants jointly cooperate and handle HR matters related to employees at the Chattanooga mill. Defendants jointly handle risk management matters, insurance matters, payment of employees, and the training, supervision, and control of employees. Defendants jointly codetermine matters governing the essential terms and conditions of employment, including promotions, salaries, insurance, hiring, and firing. Further, Defendants collectively supervise employees' activities and provide employee rules and procedures, conditions, and instructions for

employees at the Chattanooga mill. As such, Defendants should be considered the joint employer and/or single employer of the workers employed at the Chattanooga mill.

14. Upon information and belief, Defendants have an interrelation of operations including common offices, common record keeping and shared finances and equipment. Defendants further have common management, common ownership, and common directors/ executives. Defendants also have common financial control of their operations and common control of their labor relations and personnel. These entities should therefore be considered the joint employer and/or single employer of the workers employed at the Chattanooga mill.

15. The Decedent, Cornelius Heard, Sr. ("Mr. Heard"), was employed as a First Helper/Operator at the Chattanooga mill, where he had begun employment in September 2016.

16. At the time of his death, Cornelius Heard, Sr. was living with his children Cornesha Heard and Cornelius Heard, Jr., as a single parent.

17. The Chattanooga mill is a physical environment which during certain months can be extremely hot and oppressive.

18. Job announcements for positions at the Chattanooga mill state that the "ability to withstand demanding physical labor and harsh conditions – extreme heat (120+ degrees F in summer)," as well as "12-hours of standing, bending, pulling/pushing, and loud equipment noise," are requirements of employment imposed by the working environment at that location.

19. Defendants were well aware of the oppressive environment at the Chattanooga mill. On several prior occasions, the extreme conditions had caused employees to become sick and require medical treatment. In some cases, it was necessary to call ambulances to transport ill, overheated workers to the hospital.

20. Nevertheless, Defendants did not exhibit sympathy or concern for their workers under these harsh conditions. To the contrary, employees who became sick due to the extreme conditions of the Chattanooga mill were customarily threatened with discipline and discharge if they chose to attend to their medical needs. Some ill employees were prevented from seeking medical care, warned that they could not leave the premises, and instructed to either continue working or wait in an office or break room until the end of their shifts.

21. Since 2000, approximately $2.3 million in administrative fines have been assessed against Defendants for safety-related violations.

22. While Mr. Heard was generally officially scheduled for an 11:00 p.m. – 7:00 a.m. schedule, in reality he was typically forced to work 12 hours per day, 6 days per week – and sometimes 7 days per week. His schedule forced him to miss several necessary medical appointments, a fact that was known to his supervisors.

23. Mr. Heard had a heart condition, a fact that was known to representatives of Defendants. At one point during his employment, in fact, Mr. Heard had obtained an authorization for protected leave under the Family & Medical Leave Act with respect to his heart condition. Two weeks prior to his death on the job at the Chattanooga mill, Mr. Heard's health condition, combined with the harsh environment at the Chattanooga mill, caused him to become ill and faint, and he almost passed out while working. Despite being aware of this incident, Defendants made no effort to assist Mr. Heard with his health issues.

24. On or about May 24 or 25, 2021, Mr. Heard was scheduled to work the night shift at the Chattanooga mill.

25. No safety manager was on the premises during the night shift on May 24-25, 2021.

26. During the course of his shift, Mr. Heard began to experience significant chest pains. Alarmed and fearful, he informed his night supervisor, Corey Reece, of the situation, advising him that he thought he needed to go home. Mr. Reece rejected this request, advising Mr. Heard that if he left the premises he would be disciplined and, in all likelihood, terminated. Instead, Mr. Reese advised Mr. Heard to get some chicken soup from the vending machine in the break room.

27. As a single parent, Mr. Heard felt that he was not in a position to risk losing his job. Despite his chest pains, therefore, he followed Mr. Reece's instructions and retrieved chicken noodle soup from the vending machine. While sitting in the break room eating soup with a coworker, however, Mr. Heard's chest pains grew worse. He advised Mr. Reece that he had a serious health concern and that he felt he needed to go directly to the hospital. Once again, however, Mr. Reece advised him that if he left the premises he would receive an attendance point and be terminated; he therefore encouraged Mr. Heard to instead finish his soup.

28. This was not the first occasion on which Mr. Reece callously ignored a worker's health concerns and thereby exacerbated the employee's medical issues. On at least one prior occasion, Mr. Reece refused to allow an overheated worker to leave the Chattanooga mill to go to the hospital, going so far as to instruct the worker at the end of his shift that he still needed to stay at the mill for thirty minutes and attempt to urinate before leaving. The worker, who suffered acute renal failure, hyperkalemia, dehydration, and rhabdomyolysis, was in intensive care for several days, during which time he received dialysis and other medical treatments. These facts were known to Defendants, which, upon information and belief, took no action to discipline, terminate, or train Mr. Reece as the result of his actions in that situation.

29.     While working on his assigned machine after having eaten chicken soup in the break room at the Chattanooga mill, Mr. Heard had a fatal heart attack.  He collapsed and was taken to the CHI Memorial North Park Hospital, where he died.

30.     Mr. Heard's daughter, Cornesha Heard ("Ms. Heard"), worked at her job at a local Chipotle restaurant until approximately 11:30 p.m., when she went home.  Ms. Heard stayed up until approximately 3:00 a.m. before falling asleep.  When she awoke around 6:00 a.m., she texted her father to see where he was, but she received no response.

31.     Around 6:30 a.m. that morning, Ms. Heard received a telephone call from a supervisory employee, Terrance Starling, advising her that something had happened with respect to her father, that he did not have any details, and that she should call a telephone number that he gave her for additional information.  Ms. Heard made that telephone call and spoke with a representative of Defendants who advised her to go to the CHI Memorial North Park Hospital.

32.     Arriving at the hospital, Ms. Heard was informed that her father had died earlier that morning.

33.     Defendants maintain video cameras throughout the Chattanooga mill, including cameras in the areas where Mr. Heard was working at the time of his death.

34.     Initially, Ms. Heard was told that video footage existed of the incident in which her father collapsed and that she would be provided with the opportunity to view that footage.  Later, however, her requests to view the video footage were deflected by Defendants; representatives at the Chattanooga mill told her to speak to individuals in other departments and then ultimately the corporate office, which instead referred her back to the same individuals with whom she had spoken previously at the Chattanooga mill.  Her repeated attempts to follow up on the status of the video

footage were ignored. Ultimately, Ms. Heard was informed that the video footage was no longer available.

35. When Mr. Heard's family went to the Chattanooga mill to pick up his personal belongings, the keys to his car were missing. It was then determined that law enforcement officers and representatives of the company had with no legitimate purpose attempted to utilize Mr. Heard's car keys to enter his vehicle, but Mr. Heard's coworkers had prevented them from doing so.

36. As Mr. Heard's employer, Defendants had a duty to provide a safe and healthy working environment for their employees, including Mr. Heard. Defendants likewise had a duty to respond in a professional, appropriate manner to their employees' health concerns, particularly when employees expressed a belief that they were having significant health episodes.

37. By their own admissions and experience, Defendants were aware of both the oppressive, dangerous environment at the Chattanooga mill and of prior episodes when employees had found it necessary to seek immediate medical care while working at that location. Defendants were also aware of the prior incident in which Corey Reece had exacerbated an employee's serious medical condition by refusing his request to go to the hospital and instead instructing him to stay at the facility and try to urinate.

38. Defendants, however, failed to take adequate steps to create a safe, healthy working environment. Though Defendants employed safety managers at the Chattanooga mill, they failed to have a safety manager or safety officer on site during the night shift on May 24-25, 2021. When advised multiple times that Mr. Heard was having chest pains and felt that he needed to go home – and then that he needed to instead be taken immediately to a hospital – Defendants, through their supervisory agents, including Corey Reece, ignored those concerns; even more egregious, Defendants' agents advised Mr. Heard that he would be penalized, disciplined, and terminated if he

left. These threats were made despite the fact that the same agent(s) believed Mr. Heard's claims as to his health concerns, offering him the (spurious) medical advice that he should eat some chicken noodle soup to address his chest pains. Upon information and belief, neither Mr. Reece nor any other representative of Defendants consulted with any of their safety managers or safety officials as to how to respond to the health concerns voiced by Mr. Heard.

39. Defendants' negligent, reckless, and/or intentional conduct, in terms of negligently failing to train their supervisory agents, including Corey Reece, as to how to properly respond to employee health concerns, negligently retaining and/or failing to appropriately discipline Mr. Reece despite his prior acts and/or omissions in endangering the health and lives of Defendants' employees, failing to maintain a safe, healthful environment, and threatening Mr. Heard when confronted with a request to go to the hospital to address the chest pains that ultimately took his life, constituted a knowing breach of the duty owed by Defendants to Mr. Heard.

40. Defendants' negligent, reckless, and/or intentional actions and/or omissions were the proximate cause of Mr. Heard's death.

41. As a direct and proximate result of the negligence, reckless, and/or intentional acts or omissions of Defendants, Mr. Heard suffered injury, including, but not limited to, his death, as well as fear, pain, and suffering immediately prior to his death.

42. As a further direct and proximate result of the breaches of the duty owed by Defendants, Cornesha Heard and Cornelius Heard, Jr. suffered damages including, but not limited to, loss of the support, consortium, society, and services of their father, Mr. Heard.

43. As a further direct and proximate result of the breaches of the duty owed by Defendants, Cornesha Heard and Cornelius Heard, Jr. incurred medical, funeral, and other final expenses.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. That proper process be issued and served upon Defendants and that Defendants be required to answer this Complaint within the time period provided by law;

B. That, in accordance with the Federal Rules of Civil Procedure, Plaintiffs be granted a trial by jury on all issues;

C. That this Court enter an order awarding Plaintiffs judgment against Defendants for punitive or exemplary damages;

D. That this Court enter an order granting Plaintiffs a judgment against Defendants for compensatory damages including, but not limited to, damages for wrongful death in the amount of Eight Million Dollars ($8,000,000.00);

E. That this Court enter an order granting Plaintiffs pre- and post-judgment interest, along with the attorneys' fees and costs, including, but not limited to, discretionary and non-discretionary costs, as allowed by law; and

F. For such other, further, special, extraordinary, and general relief to which Plaintiffs are entitled in law and/or equity under the circumstances of this cause.

Respectfully submitted,

**EVANS HARRISON HACKETT PLLC**

By: */s/ Christopher T. Varner*
Maury Nicely (BPR No. 018997)
Christopher T. Varner (BPR No. 018260)
835 Georgia Avenue, Suite 800
Chattanooga, TN 37402
Phone: 423.648.7890
Fax: 423.648.7897
mnicely@ehhlaw.com
cvarner@ehhlaw.com
***Counsel for Plaintiffs***